Filed 6/30/21  P. v. Rang CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C086362 |
| Plaintiff and Respondent, | (Super. Ct. Nos. SF116876G, STK-CR-FMISC-2017-0014377) |
| v. | |
| SAVANN RANG, | |
| Defendant and Appellant. | |

Fourteen-year-old Rin Ros was beaten to death by a group of Stockton gang members, the Crazy Town Crips.  Defendant Savann Rang, who was 21 years old at the time of the crime, was part of that group.  Following a jury trial, defendant was convicted of second degree murder with a gang enhancement (Pen. Code, §§ 187, subd. (a), 186.22, subd. (b))[1] along with the crime of active participation in a street gang (§ 186.22, subd.

---

[1]    Undesignated statutory references are to the Penal Code.

1

(a)).  He was sentenced to a state prison term of 15 years to life plus 10 years eight months.

He contends on appeal that his conviction should be reversed in light of Senate Bill No. 1437 (Senate Bill 1437), the sentence for the gang count must be stayed pursuant to section 654, and the matter should be remanded pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*) to allow him to make a record for a future youthful parole hearing.  In a supplemental brief, he contends the gang enhancement on his murder conviction is unauthorized.

Any relief under Senate Bill 1437 must be pursuant to the resentencing hearing afforded for claims under that provision rather than through an appeal of the underlying conviction, but the gang enhancement on the murder conviction must be stricken.  The sentence on the gang count should have been stayed pursuant to section 654 since the murder was a predicate offense for that crime.  Finding defendant is entitled to a *Franklin* remand, we shall affirm and remand with directions to impose a full term sentence on the gang count and stay it  pursuant to section 654 and to hold a *Franklin* hearing.

BACKGROUND

*The Attack*

On August 6, 2010,[2] 14-year-old Rin Ros made plans to go to the mall and the movies with his friends, 24-year-old Ketmany Keopadapsy and 16-year-old D.S.  Keopadapsy was an active member of the Asian Streetwalkers (ASW) gang, a rival to Ros's gang, the Crazy Town Crips (CTC).  D.S. was not a gang member.  Keopadapsy picked up Ros in his four-door multicolored Honda Civic between 1:00 and 2:00 p.m.  He was in the driver's seat, with Ros in the front passenger seat as they waited for D.S.'s arrival.

---

[2]     Defendant did not file a notice of appeal until January 29, 2018, being allowed to file the late notice following an order to show cause from the Supreme Court.

After about 15 to 20 minutes, a white Acura pulled up behind them, stopping six to seven inches from the Honda. Three or four men were in the car. Two of the occupants, Michael Muy and Ly So, exited the Acura and went up to the Honda's front passenger window, where they told Ros to get out of the car. Defendant, the driver of the Acura, got out and stood several inches in front of the Honda.[3] When Ros got out of the Honda, Muy punched him in the face; he and So struck him several times until Ros fell to the ground.

When Ros fell, several teenage Asian males joined the attack, kicking and stomping him. As the attack continued, someone said, "Nigga, you are going to die; we're going to hurt you." A majority of the blows were to Ros's upper body, primarily on his face. He did not try to fight back, but put his hands up against his face and yelled out, "Let go of me."

One of the men blocked the driver's side door of Keopadapsy's car, preventing him from getting out. He called D.S. and told him that Ros was getting "jumped" or beat up. D.S. heard a punching or smacking sound in the background when he took the call, and told Keopadapsy to get help. Keopadapsy replied that he was trying to but could not get help.

The attack lasted for about 15 minutes. Ros was on his back, limp, and not moving. Muy, So, and a third assailant left in the Acura with defendant, the driver, while the rest left on foot. After they left, Keopadapsy got out of the car to see his beaten friend, and then called D.S. and told him Ros "got beat up." D.S. went to the location with his brother and cousin, where he found Ros lying on the sidewalk with his face

---

[3]     Defendant was 21 years old at the time of the crime, he was five feet six inches tall and weighing 201 pounds. Muy was 19 years old, five feet 11 inches tall and weighing 160 pounds, and So was 23 years old, five feet 10 inches tall and weighing 145 pounds. Ros was five feet seven inches tall and weighing 142 pounds.

covered in blood.  It was about 10 to 15 minutes from when D.S. heard over the phone the men tell Ros to get out of the car to when he found Ros.

The group lifted Ros into the Honda's back seat; Ros was like a rag doll and had to be held up while they took him to Ros's aunt's apartment.  Keopadapsy declined to take Ros to the hospital because he "did not want to deal with all that stuff," and would not call 911 because he could not call the police.  Ros gasped for breath twice but was otherwise unresponsive as they drove to the apartment.

Ros was taken from his aunt's apartment to the hospital via ambulance.  He died from a severe traumatic brain injury caused by blunt trauma of the head, face, and neck. He was struck with at least 50 blunt force blows to the head and body, and his head had been crushed against an unyielding surface, such as a cement or concrete ground surface. He sustained defensive wounds and a mark around his wrist suggested he was gripped there during the attack.  He would have died even if driven straight to the hospital.

*Gang Evidence*

Stockton Police Detective Richard Slater testified as an expert on Asian gangs. The largest Asian gang in Stockton was the Loc Town Crips (LTC), which claimed the area around the apartments where Ros lived with his aunt.  The CTC was a gang from the Carrington area, whose primary criminal activities included homicide, vehicle theft, assault with a deadly weapon, robbery, and illegal possession of weapons.  CTC's 15 validated members included:  23-year-old Ly So, 21-year-old defendant, 19-year-old Michael Muy, 16-year-old Ron Korm, 15-year-old Kailer Sam, 15-year-old Allen Phalit, 14-year-old Eddie Yam, and 14-year-old Jereme Sin.  Ros was also a CTC member.

Muy's brother Mason Chhay had previously seen defendant drive the Acura used in the attack.  According to Chhay, at the time of the attack, there were rumors that Ros jumped from gang to gang, causing him to be disliked by many people.  Ros was wearing a red rag, which made almost everyone want to get him.

4

Detective Slater opined that a gang member who jumps to a rival gang is considered a rival or no longer good with the former gang. To leave a gang, a member must either slide out or jump out. Jumping out of a gang involves beating up the departing member, who is not allowed to fight back. A member who does not talk or associate with his gang will be "put in check" or assaulted. Sometimes younger members will commit the assault in order to put in work for the gang. There was an extreme hatred for Ros because he was hanging out with members of other gangs, the LTC and the Rascals. Jumping to or associating with a rival gang and "talking smack" about your own gang is an extreme form of disrespect.

Ros was jumped by four to five Asian men at the mall on the day before his killing; he was able to walk away from the fight. He was assaulted again the following day because he continued to associate with a rival, showing that the prior attempt to check him did not work.

Detective Slater opined that defendant was an active participant in the CTC, based on his statements to police and active participation in the attack. According to Detective Slater, defendant committed the charged crimes for the benefit of, at the direction of, or in association with the CTC, with the intent to promote, further, or assist in any criminal conduct by its members.

*Other Evidence*

Keopadapsy and Ros were cousins by marriage. Ros told Keopadapsy that he wanted out of CTC. Before the fatal attack, CTC had done a "check up" on Ros; the CTC members jumped Ros because they were trying to jump him out of the gang.

Defendant was interviewed by Stockton Police Sergeant Mark Reynolds at the police station. Defendant said he had found out from CTC gang member Ron Korm that Ros was by Panella Park. He explained they wanted to put Ros in check because they were mad at him. Defendant drove around the area looking for Ros. Upon finding him, defendant parked the car next to the car Ros was in; the men ran out, "And just took him

5

out." The men wanted to know why Ros was kicking it with the enemy, the ASW gang. One of the men kept Keopadapsy in the car, and told him to put the phone down when Keopadapsy tried to call for help. Most of them kicked Ros and they all participated fairly evenly in beating him. Defendant said he stayed near his car during the attack.

After the attack, defendant dropped Muy at the mall and bought beer with So. After that, he and So went to So's house to drink and play cards. Defendant was a "big homey" in the CTC when Ros was killed.

According to defendant, Ros jumped into the LTC, jumped out, went to the CTC, but still hung out with the LTC and ASW. He was a "buster," a type of person nobody likes. Jumping from gang to gang is why "they will put him in check or probably killed," but what they did was "just by check mode."

Thongchanh Sivilay and his sister were friends with Ros. Sivilay was a member of the Asian Psychopaths gang but left in 2009. He had heard Ros was part of a gang and wanted to get out.

On the afternoon of the killing, Sivilay received a phone call from D.S. telling him Ros had been badly beaten up and he needed to come over to Ros's aunt's house. Sivilay thought Ros was jumped by CTC members because they incorrectly thought he was talking smack about them. As Sivilay drove to Ros's aunt's house, Keopadapsy told him on the phone that eight guys from C-Town or Carrington attacked Ros for gang-related reasons.

DISCUSSION

I

*Senate Bill 1437*

Defendant contends his murder conviction should be reversed due to the elimination of the natural and probable consequences theory of liability for murder.

During the pendency of this appeal, Senate Bill 1437 was signed into law. Senate Bill 1437 was enacted to "amend the felony murder rule and the natural and probable

6

consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder and addresses liability for murder.

As pertinent here, Senate Bill 1437 added subdivision (a)(3) to section 188, which reads as follows: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."

Defendant asserts Senate Bill 1437 applies retroactively to his case because it reduces the punishment for crime and his case is not final. Since he was prosecuted under, and the jury was instructed with, the natural and probable consequences theory of guilt for murder, defendant concludes Senate Bill 1437 applies to him and we should reverse his murder conviction.

As with other enactments that have reduced penalties for crimes (see §§ 1170.18 [resentencing under Prop. 47], 1170.126 [resentencing under Prop. 36]), Senate Bill 1437 contains a provision for addressing claims of defendants who were convicted of murder prior to its effective date. Senate Bill 1437 also enacted section 1170.95, which permits defendants "convicted of felony murder or murder under a natural and probable consequences theory. . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ." (§ 1170.95, subd. (a).) Like the resentencing provisions of Propositions 36 and 47, section 1170.95 provides a detailed mechanism for obtaining resentencing by petition.

A person may file a section 1170.95 petition if: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3).)

"The petition shall be filed with the court that sentenced the petitioner and served by the petitioner on the district attorney, or on the agency that prosecuted the petitioner, and on the attorney who represented the petitioner in the trial court or on the public defender of the county where the petitioner was convicted. If the judge that originally sentenced the petitioner is not available to resentence the petitioner, the presiding judge shall designate another judge to rule on the petition." (§ 1170.95, subd. (b)(1).)

The court then reviews the petition for a prima facie case, and will appoint counsel for petitioner if requested. (§ 1170.95, subd. (c).) The prosecuting agency has 60 days to file an answer to the petition, and petitioner has 30 days to file a reply, with time extensions permitted for good cause. (*Ibid*.) If the court finds the petition establishes a prima facie case, then it issues an order to show cause. (*Ibid.*) It then has 60 days to hold a hearing on the petition, at which the prosecution must prove beyond a reasonable doubt that petitioner is ineligible for sentencing, unless there was a prior finding that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, in which case the murder conviction and any enhancements are vacated. (§ 1170.95, subd. (d)(1)-(3).) If the petitioner is entitled to relief, the murder conviction and any enhancements will be vacated, and, if "murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be

8

redesignated as the target offense or underlying felony for resentencing purposes." (§ 1170.95, subd. (e).)

In *People v. Martinez* (2019) 31 Cal.App.5th 719 (*Martinez*), Division Five of the Second District Court of Appeal found a defendant must file a section 1170.95 petition in the trial court to obtain relief under Senate Bill 1437. (*Martinez,* at pp. 729-730.) Relying on California Supreme Court decisions finding the resentencing provisions of Propositions 36 and 47 were the sole avenues for relief under those provisions (see *People v. Conley* (2016) 63 Cal.4th 646 (*Conley*) [Prop. 36]; *People v DeHoyos* (2018) 4 Cal.5th 594 (*DeHoyos*) [Prop. 47]), the Court of Appeal found section 1170.95 similarly limited relief under Senate Bill 1437. (*Martinez*, at pp. 725-728.) We agree with *Martinez*.

In *Conley*, the Supreme Court held the resentencing provision for Proposition 36, section 1170.126, was the sole means by which a person, sentenced before Proposition 36 took effect, could obtain relief. (*Conley, supra*, 63 Cal.4th at pp. 661-662.) The Supreme Court noted that Proposition 36 addressed the question of retroactivity through section 1170.126, which did not distinguish between those serving final sentences and those whose sentences were not yet final. (*Conley,* at p. 657.) Resentencing was not automatic under section 1170.126 but could be denied if certain disqualifying factors were present or if the resentencing posed an unreasonable risk of danger to public safety. (*Conley,* at pp. 658, 659.) Whether such exclusions applied required findings that typically would not be made at the trial that led to the defendant's conviction. (*Id*. at pp. 659-660.) "In short, application of the Reform Act's revised sentencing scheme would not be so simple as mechanically substituting a second strike sentence for a previously imposed indeterminate life term." (*Id*. at p. 660.) From this, the Supreme Court concluded that the voters intended for section 1170.126 to be the sole means of relief for defendants sentenced before Proposition 36 took effect. (*Conley,* at p. 661.)

9

The same result applies to the resentencing provision of Proposition 47, section 1170.18 in *DeHoyos*. "Similar considerations lead us to a similar conclusion in this case. Like the Reform Act, Proposition 47 is an ameliorative criminal law measure that is 'not silent on the question of retroactivity,' but instead contains a detailed set of provisions designed to extend the statute's benefits retroactively. [Citation.] Those provisions include, as relevant here, a recall and resentencing mechanism for individuals who were 'serving a sentence' for a covered offense as of Proposition 47's effective date. [Citation.] Like the parallel resentencing provision of the Reform Act, section 1170.18 draws no express distinction between persons serving final sentences and those serving nonfinal sentences, instead entitling both categories of prisoners to petition courts for recall of sentence. [Citation.] And like the resentencing provision of the Reform Act, section 1170.18 expressly makes resentencing dependent on a court's assessment of the likelihood that a defendant's early release will pose a risk to public safety, undermining the idea that voters 'categorically determined that "imposition of a lesser punishment" will in all cases "sufficiently serve the public interest." ' [Citations.]" (*DeHoyos, supra*, 4 Cal.5th at p. 603.)

Defendant argues *Conley* and *DeHoyos* are inapposite, as the section 1170.95 procedure does not contain any disqualifying factors or a future dangerousness determination. While section 1170.95 contains no such provisions, it is nonetheless analogous to sections 1170.18 and 1170.126. "Like Propositions 36 and 47, Senate Bill 1437 is not silent on the question of retroactivity. Rather, it provides retroactivity rules in section 1170.95." (*Martinez, supra*, 31 Cal.App.5th at p. 727.) We also agree with *Martinez* that neither *Conley* nor *DeHoyos* was contingent on the future dangerousness provisions of sections 1170.18 and 1170.126. (See *Martinez,* at p. 728.) *Conley* noted that the "cases do not 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require 'that the Legislature demonstrate its intention

10

with sufficient clarity that a reviewing court can discern and effectuate it.' [Citations.]" (*Conley, supra*, 63 Cal.4th at pp. 656-657.) Likewise, the Supreme Court has elsewhere explained that in *Conley*, "because the legislation contained its own retroactivity provision, we did not apply *Estrada*'s different kind of retroactivity." (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 312.)

Section 1170.95 does not mechanically apply to every petitioner who makes a prima facie case of eligibility for relief. Rather, such a finding affords People the opportunity to prove the petitioner's ineligibility beyond a reasonable doubt at a hearing on the petition. At that hearing, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).) Appellate courts are not the proper venue for holding hearings where new evidence is taken and factual findings are made. (See *Crofoot Lumber, Inc. v. Lewis* (1962) 210 Cal.App.2d 678, 681 ["The reluctance of appellate courts to take evidence stems in part from the fact that they are not equipped for any appreciable foray into this field"].) Knowing this, the Legislature placed exclusive jurisdiction over petitions for relief under section 1170.95 in the trial courts.

The Legislature intended to afford the People an opportunity to prove that defendants who were convicted of murder under a natural and probable consequences theory would nonetheless be guilty of murder had Senate Bill 1437 been in effect at the time of the conviction. Accepting defendant's argument would frustrate this purpose. Accordingly, we conclude his only means for relief is by filing a section 1170.95 petition in the trial court.

II

*Section 654*

Defendant asserts and the Attorney General concedes that the sentence for the substantive gang offense, active participation in a criminal street gang, must be stayed pursuant to section 654. We agree.

Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"It has long been held that section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective. [Citations.]" (*People v. Calderon* (2013) 214 Cal.App.4th 656, 661.) "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct. [Citation.]' [Citations.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.]" (*Ibid.*)

In *People v. Mesa* (2012) 54 Cal.4th 191, our Supreme Court held that section 654 did not permit separate punishment for the section 186.22, subdivision (a) crime of active participation in a criminal street gang when the only evidence of such participation is the current charged offenses, even if there were multiple objectives. (*Mesa*, at pp. 199-200.) This is because the crime of being an active participant in a criminal street gang requires not only that the defendant be a member of the gang, but that he also promote, further, or assist in the felonious conduct. (*Id.* at pp. 196-197.) Thus, where the underlying felony

12

is also the act " 'that transform[s] mere gang membership—which, by itself, is not a crime—into the crime of gang participation,' " section 654 bars multiple punishment for that single act. (*Mesa*, at pp. 197-198.)

Here, the trial court imposed separate sentences for the murder and gang convictions even though the murder charge was one of the predicate offenses for the gang charge. The evidence shows the gang offense and the murder charge were committed in a single episode against a single victim with one purpose. Applying *Mesa*, we conclude execution of sentence on the gang conviction must be stayed pursuant to section 654. The trial court shall do so on remand. While it imposed a consecutive eight-month term at trial, on remand it must impose the full term and stay under section 654. (See *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164 ["The one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not to a sentence stayed under section 654"].)

III

*Franklin Remand*

Defendant contends he is entitled to a remand for a hearing to permit him to make a record of information that will be relevant at his future youth offender parole hearing. The Attorney General concedes the point. He is correct.

Defendant was 21 years old when he committed the crimes. As relevant here, section 3051 provides that persons who were 25 years of age or younger when they committed their controlling offense are eligible for youth offender parole hearings during their 25th year of incarceration. In *Franklin, supra*, 63 Cal.4th at pages 272, 277, after the defendant was sentenced to 50 years to life in prison for a murder he committed when he was 16 years old, the Legislature enacted sections 3051 and 4801, which entitled the defendant to a youth offender parole hearing. Our high court remanded the case for the limited purpose of determining whether the defendant was afforded an adequate opportunity to make a record of information that will be relevant to his future youth

13

offender parole hearing. (*Franklin,* at pp. 284, 286-287.) Here, no evidence relevant to defendant's childhood and background was presented at his sentencing hearing. Therefore, as in *Franklin*, a limited remand is appropriate for the purpose of allowing defendant to make a record that will be relevant to his future youth offender parole hearing.

IV

*Gang Enhancement*

Defendant contends in a supplemental brief that the 10-year gang enhancement imposed with his second degree murder conviction must be stricken. The Attorney General concedes the point. We agree.

Section 186.22, subdivision (b)(1)(C) provides for an additional term of 10 years where a defendant is convicted of a violent felony that was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist criminal conduct by gang members. However, subdivision (b)(5) states that "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." The Supreme Court has held that if the parole limitation provision of subdivision (b)(5) is applicable, the 10-year enhancement may not be imposed. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1007.)

We will therefore order that the 10-year enhancement imposed pursuant to section 186.22, subdivision (b)(1)(C) be stricken.

DISPOSITION

The gang enhancement (§ 186.22, subd. (b)) is stricken. The matter is remanded for the purpose of allowing defendant to make a record of information that will be relevant to his future youth offender parole hearing and reimposition of a full term stayed sentence on the active participation in a street gang conviction. (§ 186.22, subd. (a).) The judgment is otherwise affirmed. The trial court is directed to prepare an amended

abstract reflecting the modified judgment, and to forward a certified copy to the Department of Corrections and Rehabilitation.

/s/

BLEASE, Acting P. J.

We concur:

/s/

DUARTE, J.

/s/

KRAUSE, J.